**PILOT FREIGHT CARRIERS, INC.,**
**Plaintiff,**

v.

**LOCAL 560, INTERNATIONAL BROTHERHOOD OF TEAMSTERS,**
etc., Defendant.

Civ. A. No. 74–339.

United States District Court,
D. New Jersey.

April 1, 1974.

Carpenter, Bennett & Morrissey, by James J. Crowley, Jr., Newark, N. J., for plaintiff.

Franzblau, Cohen & Falkin, by Edward A. Cohen, Newark, N. J., for defendant.

## OPINION

STERN, District Judge.

This is an action by Pilot Freight Carriers, Inc., to enjoin permanently Local 560, International Brotherhood of Teamsters and its membership from continuing a strike which began on March 1, 1974, when the membership of Local 560, all employees of the plaintiff, refused to cross a picket line established by Teamsters Local 512, at Pilot's plant in Moonachie, New Jersey, resulting in a complete shut down of Pilot's facility.

Pilot and Local 560 entered into a contract effective July 1, 1973, which contains a no-strike clause, and Pilot here sues to enforce that agreement.

The plaintiff's application is brought pursuant to Section 301 of the Labor Management Relations Act, 1947, 29 U. S.C. Section 185, which provides:

(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as de-

fined in this chapter, or between any such labor organization, may be brought in any district court of the United States having jurisdiction of the parties, without respect . . . to the citizenship of the parties.

On March 11, 1974, Pilot Freight Carriers applied to this Court for a Temporary Restraining Order against Local 560, International Brotherhood of Teamsters, etc. The application was denied.

On March 21, 1974, an evidentiary hearing was held on plaintiff's application for a preliminary injunction. The hearing was held on short notice at the request of the parties due to the exigencies of the situation. By consent of all the parties, the motion for a preliminary injunction has been consolidated with a prayer for a permanent injunction.

At the conclusion of the hearing, during which plaintiff presented a witness, whose testimony is described below, defendant moved to dismiss the complaint, pursuant to F.R.Civ.P. 41(b) which states in relevant part:

. . . After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a). Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision . . . operates as an adjudication upon the merits.

For the reasons set forth below, the Court grants defendant's motion and dismisses the application for a preliminary and permanent injunction.

On the basis of the evidence presented, the Court makes the following findings of fact: At approximately 11:45 A.M. on Friday, March 1, 1974, pickets appeared at plaintiff's Moonachie, New Jersey terminal with signs reading, "TEAMSTERS LOCAL 512 ON STRIKE AGAINST PILOT FREIGHT CARRIERS INC. Jax. Fla. Only."

Teamsters Local 512 is a Jacksonville, Florida group, currently involved in a strike for recognition as representatives for employees in plaintiff's Jacksonville terminal. Members of Local 512 have appeared at various terminals of plaintiff around the country and established picket lines. Teamsters Local 560 in Moonachie has advised its members that it recognizes the Moonachie picket line as legitimate and advised its members not to cross the picket line. The members of Local 560 have refrained from crossing the picket line of Local 512, and plaintiff's Moonachie plant has been shut down.

Plaintiff's witness has testified that an officer of Local 560 has ordered its members to obey the picket lines under penalty of having their "books lifted". Absent any evidence to the contrary, and the testimony being credible, we accept that evidence as true.

In support of its contention that a preliminary injunction should issue, plaintiff points to Article 46 of its contract with Local 560, entitled "National Master Freight Agreement" which reads in relevant section:

Article 46—Grievance Procedure and Union Liability

Section 1. The Union and the Employer agree that there shall be no strike, lock-out, tie-up, work stoppage, or legal proceedings without first using all possible means of a settlement, as provided for in this Agreement or any controversy which might arise . . .

Defendants assert a reserved exception to this provision appearing in Article 9 of the same contract:

Article 9.

| | |
|---|---|
| Protection of Rights | It shall not be a violation of this Agreement, and it shall not be cause for discharge or disciplinary action in the |
| Section 1 | event an employee refuses to enter upon any property involved in a primary labor dispute, or refuses to go through |
| Picket Lines | or work behind any primary picket line, including the primary picket lines at the Employer's place of business. |

The law in this area is in a state of flux. Competing public policy considerations, various interpretations of the contracts involved in the suits and different interpretations of the law have led to a disparity of results in the reported cases.

As a fundamental premise, this Court is bound by the legislative restraints placed on its jurisdiction by the Norris-LaGuardia Act, which provides at 29 U. S.C. Section 104:

No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

(a) Ceasing or refusing to perform any work or to remain in any relation of employment. . . .

In 1970, the United States Supreme Court discerned a narrow exception to the ·Norris-LaGuardia's prohibition of injunctive jurisdiction over labor strikes in the case of Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), and quoted the minority opinion in Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962):

A District Court entertaining an action under 301 may not grant injunctive relief against concerted activity unless and until it decides that the case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act. When a strike is sought to be enjoined because *it is over a grievance which both parties are contractually bound to arbitrate,* the District Court may issue no injunctive order until it first holds that the contract *does* have that effect; and the employer should be ordered to arbitrate as a condition ·of obtaining an injunction against the strike. Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity— . . . whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance. 370 U.S. at 228 [82 S. Ct. 1328, at 1346, 8 L.Ed.2d 440].

398 U.S. at 254, 90 S.Ct. at 1594. (First emphasis added, second emphasis in original.)

■ The plain rationale here is that when a union has gained concessions from management concerning wages, hours or conditions of employment in return for its solemn promise not to strike but to arbitrate disputes about these matters, courts will require unions to honor their bargain.

In reconciling the policies of the Norris-LaGuardia Act which forbids injunctions against strikes, and the *Boys Markets* decision enunciating a policy in favor of enforcing "no-strike" pledges in contracts where there is an arbitration provision applicable, this Court is also bound by the Supreme Court's policy in favor of arbitration as stated in United Steelworkers v. Warrior and Gulf Navigation Co., 363 U.S. 574, 582–583, 80 S. Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960):

An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not sus-

ceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage. (Fns. omitted) [1]

In United Steelworkers v. American Manufacturing Co., 363 U.S. 564, 80 S. Ct. 1343, 4 L.Ed.2d 1403 (1960), while the court held that it is not a judicial function to inquire into the merits of the grievance sought to be arbitrated, it *is* a judicial function to ascertain "whether the party seeking arbitration is making a claim which on its face is governed by the contract." 363 U.S. at 568, 80 S.Ct. at 1346. This Court finds plaintiff does not make such a claim.

Application of the *Boys Markets* exception to the Norris-LaGuardia Act has not been uniform; and it is this lack of uniformity that squarely faces this Court, requiring it to follow the reasoning in those cases which seems most in keeping with the *Boys Markets* exception, and to reject those cases which seem predicated more on a judicially originated notion of appropriate public policy than a careful application of legislative command as interpreted by the Supreme Court in *Boys Markets, supra.*

The two major schools of interpretation are represented respectively by Monongahela Power Co. v. Local No. 2332 International Brotherhood of Electrical Workers, 484 F.2d 1209 (4th Cir. 1973); and Amstar Corporation v. Amalgamated Meat Cutters and Butcher Workmen of North America, 468 F.2d 1372 (5th Cir. 1972).

In *Monengahela, supra,* as in the case sub judice, members of the defendant union refused to cross a picket line established by another local of the IBEW in a show of "sympathy and solidarity". The relevant contract in force provided that:

. . . Any dispute between the Company or employees covered by this Agreement, with respect to the interpretation, application, or claimed violation of any express provision of this Agreement shall constitute a grievance which shall be settled in accordance with the provisions of this Article.

After a review of the history of the application of the Norris-LaGuardia Act, the court found its solution in an application of what is described as "the narrow *Boys Markets* exception." (484 F. 2d at 1213)

The *Monongahela* court then proceeded to widen considerably the "narrow *Boys Markets* exception", using as a driving wedge the *United Steelworkers* case, *supra,* which advised a liberal interpretation of arbitration clauses, a case which was not concerned with injunctions against labor strikes. The court also held that the workers' statutory right [2] to refrain from crossing the picket line was waived by the "no-strike" clause.

In similar fashion, the District Court for the Southern District of New York issued an injunction to stop a strike in the case of Barnard College v. Transport Workers, 372 F.Supp. 211 (1974), where the contract provided for arbitration of "a[ny] 'dispute or grievance *arising under this contract'*," with the further explanation that "(g)rievances shall be deemed to consist only of disputes arising out of the interpretation or application of this Agreement." (372 F.Supp. at 212).

The defendants in *Barnard College* refused to cross picket lines set up by another union. The court found an arbitrable dispute, that is, one arising out of the interpretation of the contract,

1. This case is the second in what has been termed "The United Steelworkers Trilogy". The Trilogy includes: United Steelworkers v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1430 (1960); United Steelworkers v. Warrior & Gulf Navigation Co., *supra*; and United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

It should be noted, however, that the United Steelworkers Trilogy did not contend with anti-strike injunctions since it was the union in that case that sought to enforce the arbitration agreement against management which was unilaterally laying off workers.

2. 29 U.S.C. Sections 157, 158(a), (b).

since in deciding whether the "no-strike" pledge extended to include the refusal to honor another union's picket lines, a contract clause would have to be interpreted, that being viewed as an arbitrable issue, despite the fact there was no controversy between the defendant and the plaintiff as to the hours, wages or working conditions of the employees.

■ The *Barnard College* court buttressed its position, as did the *Monongahela* court, in reciting the federal policy in favor of arbitration as a means to settle labor disputes, citing *United Steelworkers, supra.*

This Court, however, finds the reasoning in Amstar .v. Amalgamated Meat Cutters and Butcher Workmen of North America, *supra,* more cogent, and more in keeping with the holding of *Boys Markets.*

In *Amstar,* members of the Meatcutters Union refused to cross the picket lines set up by local unions affiliated with the International Longshoremen's Association. In reversing the District Court's grant of an injunction against the strike, the Fifth Circuit summarized the requisites for obtaining a *Boys Markets* injunction:

(1) the strike must be in breach of a no-strike obligation under an effective collective agreement,

(2) *the strike must be 'over' an arbitrable grievance,* and

(3) both parties must be contractually bound to arbitrate the underlying grievance which caused the strike.

468 F.2d at 1373. (Emphasis added)

■ The *Amstar* decision focused on what this Court perceives to be the key issue in resolving the dispute at hand:

The pivotal question presented by this appeal is whether a district court may issue a *Boys Markets* injunction when the legality of the strike sought to be enjoined is the alleged arbitrable dispute. Recognizing that under the doctrine of *Boys Markets* an injunction is permissible only if the underlying dispute 'over' which the strike has been called is arbitrable, we reverse. 468 F.2d at 1372, 1373 (Fns. omitted)

Then in language which we find to be directly in point, the court went on to hold:

The strike by the Chalmette employees was not 'over a grievance' which the parties were contractually bound to arbitrate. Rather, the strike itself precipitated the dispute—the validity under the Union's no-strike obligation of the member-employees honoring the ILA picket line. Were we to hold that the legality of the very strike sought to be enjoined in the present situation constituted a sufficiently arbitrable underlying dispute for a *Boys Markets* injunction to issue, it is difficult to conceive of any strike which could not be so enjoined. The *Boys Markets* holding was a 'narrow one,' not intended to undermine the vitality of the anti-injunction provision of the Norris-LaGuardia Act.

468 F.2d at 1373–1374 (Fns. omitted)

That *Boys Markets* required an underlying arbitrable issue, underlying in the sense that the issue is not the strike itself, but a dispute, contractually arbitrable, which precipitated the strike, has been recognized by this Circuit in Parade Publications, Inc. v. Philadelphia Mailers Union No. 14, 459 F.2d 369 (3d. Cir. 1972). While the facts in the *Parade* case were not precisely the same as the matter before this Court, the basic holding is in point.

In *Parade,* the union feared that Parade was establishing a new printing facility through a subsidiary corporation known as Diversified Printing. The union further alleged that it was Parade's intention to shift its printing business to the Diversified plant, and that Parade was refusing to allow the members of the union to apply for work at Diversified, which would result in jobs being phased out at Parade, and the workers being replaced by new workers at Diversified. The union members then walked out in protest, asking that preferential employment rights at the new Diversi-

fied plant be given to the members of the local unions at Parade. The management, which sought to enjoin the strike, claimed there was no dispute between Parade and the union, while the union claimed that there was such a dispute, namely the alleged plan of Parade to hire new men at the Diversified plant to replace the men working at Parade.

The union further alleged, however, that the dispute was not arbitrable since the contract did not give the union the right to submit to an arbitrator the question of whether preferential employment opportunity would be given to the workers at Parade who sought employment at Diversified.

After holding that in seeking an injunction the plaintiff must affirmatively allege that the "strike was over an arbitrable issue" (459 F.2d 369, at 373), the court reversed the lower court's granting of an injunction and continued:

> Parade's argument that the strike itself clearly created an arbitrable issue of whether the union had violated the general 'no-strike' clause does not require a different result for two reasons. First, it. is apparent from the court's reference to 'any dispute which underlies the alleged walkout' that it did not rest its decision to issue an injunction upon a finding that the strike itself created an issue which the parties have bound themselves to arbitrate. Second, this argument of Parade goes beyond anything decided in the *Boys Markets* case. Indeed, if the Diversified situation caused the strike and does not present an issue which the parties have bound themselves to arbitrate, it would run contrary to the rationale of *Boys Markets* to grant Parade an injunction. We read the opinion in that case to indicate that arbitration should be encouraged by permitting judicial enforcement of a 'no-strike' clause when the underlying issue is arbitrable, but that there should be no injunction if the underlying dispute is not arbitrable.

Similarly in the case of General Cable v. International Brotherhood of Electrical Workers, Local Union 1644, 331 F. Supp..478 (1971), the District Court of Maryland was faced with the situation that handbills were passed out by the union to its members that an informational picket line would be set up at plaintiff's plant by a sister local. The members of the defendant local did not cross the picket line despite the presence of a "no-strike" clause in their contract. The court found that the union did sanction or authorize the strike. Nevertheless, the court refused to issue an injunction against the union, holding:

> In the present case the strike or work stoppage is not over a grievance which is subject to arbitration under the collective bargaining agreement. The only grievance or dispute between the Company and Local 1644 is the result of the strike and not the cause of the strike. It does not come within the narrow exception created by the rule in *Boys Market* to the applicability of the Norris-LaGuardia Act.

331 F.Supp. at 482. (Citations omitted.)

Also in point is a case decided by the District Court of New Hampshire, Simplex Wire and Cable Co. v. Local 2208 of the International Brotherhood of Electrical Workers, 314 F.Supp. 885 (1970). Members of the local union refused to cross a picket line set up at plaintiff's plant. The picket line had been set up by quality control employees of the company, who had never been members of the Local, and who had been excluded from the coverage of the contract which contained the "no-strike" clause on which plaintiff based his application for an injunction.

The court pointed out the requirement in *Boys Markets* that the dispute must be "over a grievance which both parties are contractually bound to arbitrate." (quoting from *Sinclair*, 370 U.S. 195, 228, 82 S.Ct. 1328, 1346, 8 L.Ed.2d 440), and found that:

> In the instant case, there is no grievance within the terms of the contract

between Local 2208 and the Company. There is nothing in the collective bargaining agreement even remotely suggesting that Local 2208 has any obligations relative to the picket lines of other bargaining units. Thus, there is no dispute subject to arbitration under the *collective bargaining* agreement, and no injunctive order may be issued.

314 F.Supp. at 886 (Emphasis in the original).

There is an additional factor in the present case which compels the Court to dismiss the application for a preliminary injunction. It is the provision in the Pilot-Teamsters contract titled "Article 9—Protection of Rights, Section—Picket Lines." This provision, set out above, provides that the refusal of any employee to go through a primary picket line shall not be in violation of the contract.

Although the Court has great reservations about the holding in the *Monongahela* case as expressed above, the presence of Article 9 in this contract assists in distinguishing this case from *Monongahela*, where no such contractual reservation existed and where it was held that the union had waived its right to refrain from crossing another union's picket line in signing a contract with an arbitration provision and a no-strike pledge.

Thus, even were we to agree with the decision and rationale of *Monongahela*, we would still be compelled to deny the application for an injunction herein because the union here has expressly reserved its right to refrain from crossing a picket line.

One case has dealt squarely with this issue, Nappa Pittsburgh v. Automotive Chauffeurs, 363 F.Supp. 54 (W.D.Pa. 1973), with a result that we, albeit with respect and deference, find unconvincing, and consequently do not follow.

In *Nappa*, members of the local union in Pittsburgh refused to cross picket lines set up by striking members of another union who were seeking recogni-tion from the employer's plant in Altoona.

The court grappled with the *Amstar* case on the problem of finding an underlying arbitrable issue and found the very basis for distinguishing its case from *Amstar* in the exact contractual provision *reserving* the right not to cross the picket lines of other unions. Inasmuch as that provision was in the contract, and inasmuch as the arbitration provision was related to any grievance covered by the contract, *Nappa* determined that the arbitration provision covered the "no cross" provision, and the strike was therefore enjoinable.

In the language of the *Nappa* court:

We must then again come back to the question whether the underlying dispute in this case, that is the right of the Local Union to refuse to cross the picket line is a grievance, complaint or dispute arising between the Employer and the Union 'and covered by this Agreement.'

The Contract contained, under Article XIII, a specific provision for picket lines. In light of this specific provision it would seem that the question of the right to cross a picket line was made part of the Agreement over which the arbitration clause became a compulsory method of procedure which this Court must enforce.

363 F.Supp. at 57.

This Court finds the result in *Nappa* anomalous, whether one subscribes to the approach of *Amstar* or of *Monongahela*. When coupled with *Amstar*, *Nappa* stands for the proposition that the refusal to cross a picket line cannot be enjoined even if the contract contains an arbitration clause and a no-strike pledge; but if the contract also contains an express reservation, *preserving the right to refrain from crossing a picket line*, then the court may compel the union members to cross the picket line.

When coupled with *Monongahela*, *Nappa* is similarly anomalous in that it stands for the proposition that an arbitration provision and a no-strike pledge,

in absence of a reservation to honor the picket line of others, waives the right of union members to refrain from crossing other union's picket lines, and therefore such refusal to cross may be enjoined; but if the union seeks to reserve that right by way of an express contractual provision, then the refusal to cross may still be enjoined since the right not to cross is embodied in the contract and thereby becomes an arbitrable issue.

This Court cannot endorse such a result.

This Court has been advised that an appeal has been taken in the *Nappa* case to the Third Circuit where oral argument was held on February 28, 1974. No decision has yet issued. Affirmance of the decision in *Nappa* would, of course, be binding on this Court, but in the absence of any Third Circuit opinion, this Court must interpret the law as it currently exists.

Beyond the question of applicable law, this Court does not perceive how arbitration could possibly be useful in the resolution of this dispute. There being no underlying arbitrable grievance between the plaintiff and defendant, no dispute between them, the only subject for arbitration would be whether the strike itself (or the failure to cross the picket line) is a matter arising out of the contract. If it is found that the strike is not over a matter covered by the contract, that is, the hours, wages, and working conditions of the em-

ployees, then the strike is not enjoinable under the reasoning of *Amstar*. If, on the other hand, the strike is found to be a matter within the contract, then the strike is not enjoinable by reason of the specific reservation of the right not to cross a picket line as set forth in Article 9 of the contract.

It is this lack of any underlying arbitrable grievance that distinguishes this case from Southwestern Bell Telephone Co. v. CWA, 343 F.Supp. 1165 (S.D.Texas 1972), where the union went out on strike against the company's announced decision to institute part-time staffing on a separate seniority schedule. The contract contained a no-strike and an arbitration clause and the Texas District Court enjoined the strike, holding:

. . . Thus, in the present case, where the collective agreement contains a no strike-arbitration clause and another clause (the seniority clause) which arguably applies, *and where there is no express contractual disclaimer of the arbitrability of the subject matter of the particular dispute,* the dispute must be assumed to be arbitrable.

343 F.Supp. at 1170 (Emphasis added). (Footnote omitted.)

The underlying dispute in the present case is the recognition controversy between the Florida local and Pilot. This matter is not susceptible to arbitration between Pilot and the defendant, Moonachie, New Jersey local.[3]

---

3. It should also be noted that this matter has been before several other district courts and state courts as the Jacksonville Local has sent pickets out to plaintiff's facilities in several parts of the country. The Court has relied on information supplied by counsel for each side in compiling the following inventory of actions up to date:

1.) In Massachusetts, United States District Judge Joseph L. Tauro denied the issuance of a TRO. Argument on the TRO was held on March 12, 1974. A hearing for a preliminary injunction has been set for April 5th, and on March 19, 1974, Pilots Freight moved for re-argument on the TRO which was denied on March 26th.

2.) In the United States District Court for the Eastern District of Virginia, Richmond Division, Judge Merhige dissolved an *ex*

*parte* TRO granted in a state court. A hearing for a preliminary injunction is scheduled for March 29, 1974.

3.) In the United States District Court for the Middle District of North Carolina, Judge Ward allowed a state court TRO to expire, which was limited by its terms to March 10, 1974. A hearing was held on March 21, 1974, at which the International Teamsters were present, but this hearing was adjourned and April 3, 1974 has been set for a new hearing.

4.) An *ex parte* TRO was granted by a state court in New York, Onondaga County, on March 13, 1974. The TRO expired on March 25th. On March 15, 1974, the case was removed to the United States District Court, Northern District of New York. No hearing date has been set.

The Court would like to underscore its awareness of the important public policy issues that form the backdrop of this case. When the Norris-LaGuardia Act was passed, it was the intent of Congress to protect the nascent labor union movement from what was regarded as unsympathetic and even hostile treatment by the courts. Congress therefore stripped the United States courts of jurisdiction to enjoin strikes.

The times are very different now. The labor movement, at the cost of sweat, tears, and even blood, has become an integral and powerful part of the American economic system. This position it rightly holds. Economic realities, however, have changed, and it is now the interest of the public policy that labor disputes be settled, not by wasteful work stoppages, strife, strikes, or lockouts, in which strikers, shareholders and consumers all suffer; the economy of the nation now requires the orderly process of arbitration and peaceful negotiations. It was in this spirit that the *Boys Markets* case was decided. See also Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), and Gateway Coal Co. v. United Mine Workers, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974), where the underlying arbitrable issue was the reinstatement of mine foremen who allegedly failed to report safety hazards.

That having been said, this Court is still bound to enforce the law as it exists: the Norris-LaGuardia Act and those narrow exceptions discerned in *Boys Markets*. Further modifications in the field of labor law may be in order, but this is a task that must devolve upon the legislature, for in the face of a clear Congressional command it is in the halls of Congress, not the corridors of courthouses, that the changed emphasis in public policy is to be transfigured into new law.

The defendant's motion to dismiss the complaint is hereby granted. The above constitutes the Court's finding of fact and conclusions of law.

An appropriate Order may be submitted.

5.) Justice Cobb of the New York Supreme Court issued an *ex parte* TRO on March 8, 1974. A motion to vacate was denied by the New York Supreme Court, Appellate Division, on March 12th, and on March 14th, the action was removed to the United States District Court for the Northern District of New York, and no proceedings have been conducted there as of this date.

6.) In the United States District Court in Atlanta, Georgia, Judge O'Kelley issued a TRO against Local 728 which covered picketing at plaintiff's Atlanta and Dalton, Georgia, facilities on March 15, 1974. Judge O'Kelley found that an officer of the local union was marching in the picket line. The union has filed an appeal to the Fifth Circuit.

The Southern Conference of Teamsters brought a grievance proceeding against Pilot Freight bottomed on the company's having sought and obtained the injunctive relief in the Georgia litigation.

The grievance was brought before the National Grievance Committee, provision for which is found in Articles 8 and 45 of the National Master Freight Agreement. The Committee is comprised of equal representation from Employer Trucking, Inc. (a group of major carriers) and the Teamsters.

The Committee found that Pilot had violated its contract in seeking this injunction:

The committee finds, on the basis of the facts presented and on the basis of Pilot Freight Carrier, Inc.'s injunctive proceedings presented to the committee, which applies against individual employees covered by the National Master Freight Agreement who were respecting the picket lines established at Atlanta, Georgia and Dalton, Georgia, Pilot Freight Inc. is in violation of the provision of Article 9.