**PILOT FREIGHT CARRIERS, INC.,**
**Plaintiff,**

v.

**LOCAL 391, INTERNATIONAL BROTH-ERHOOD OF TEAMSTERS, CHAUF-FEURS, WAREHOUSEMEN AND HELPERS OF AMERICA (HERE-AFTER CALLED "391 IBT"), et al., Defendants.**

**No. C–74–69–WS.**

United States District Court,
M. D. North Carolina,
Winston-Salem Division.

April 5, 1974.

William Kearns Davis and Richard Tyndall, of Deal, Hutchins & Minor, Winston-Salem, N. C., J. W. Alexander, Jr., of Blakeney, Alexander & Machen, Charlotte, N. C., for plaintiff.

Renn Drum, of Drum & Liner, Winston-Salem, N. C., Hugh J. Beins, Washington, D. C., for Local 391.

L. N. D. Wells, Jr., Dallas, Tex., and David Previant, Milwaukee, Wis., for Intern. Brotherhood of Teamsters, etc.

## PRELIMINARY INJUNCTION

HIRAM H. WARD, District Judge.

This cause comes before the Court on plaintiff's complaint alleging breach of contract and asking for damages and injunctive relief. The particular matter now before the Court concerns plaintiff's request for a preliminary injunction. After considering the pleadings, evidence, and arguments of counsel, the Court enters the following findings of fact, discussion, and conclusions of law.

### I.

*Findings of Fact*

1. The plaintiff, Pilot Freight Carriers, Inc. (Pilot), is a common carrier of general commodity freight operating across various states under certificates of convenience and necessity issued by the Interstate Commerce Commission and is an employer within the meaning of Section 2(2) of the National Labor Relations Act (N.L.R.A.), 29 U.S.C. § 152(2), and, by its transportation of freight along the east coast of the United States and receiving annual revenues in excess of one million dollars, it is an industry "affecting commerce" within the meaning of Section 2(7) of the N.L. R.A., 29 U.S.C. § 152(7). It is a North Carolina corporation with a principal place of business in Forsyth County of that state.

2. Local 391 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Local 391) is an organization engaged in the representation of the employees of Pilot with its principal office located in Guilford County in the Middle District of North Carolina. Local 391 is a "labor organization" within the meaning of Section 2(5) of the N.L.R.A., 29 U.S.C. § 152(5).

3. Defendant International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (International) is a "labor organization" engaged in the representation of employees within the meaning of Section 2(5) of the N.L.R.A., 29 U.S.C. § 152(5). Local 391 is an affiliate of International.

4. Defendants Durham and Church are officers of Local 391, and defendant Lauck is an organizer employed by Local 391. Defendants Boger, Beasley, Vestal, and Hanes are members of Local 391 and employees of Pilot.

5. The constitution of International regulates in detail the actions of its local unions. In the area of control, the present constitution does not vary significantly from the ones examined in International Bro. of Teamsters, etc. v. United States, 275 F.2d 610 (4th Cir. 1960), and Great C. Ex., Inc. v. International Broth. of Team., 350 F.Supp. 1377 (E.D.Va.1972). Moreover, the present constitution has a provision whereby the General Executive Board can pay out-of-work benefits where it recognizes the strike as a proper one for the payment of benefits. Article XII, Section 5(a) of the constitution continues:

> Benefits shall be paid to all other member employees of the primary employer at all terminals . . . if such member employees shall have become unemployed as a direct result of a strike involving other Teamster member employees which strike has

been approved pursuant to Section 3, . . . .

The General President and General Executive Board may terminate benefits "when satisfied upon facts and information in their possession that the support of a strike or lockout should cease." Out-of-work benefits have been paid by International to about 1100 members of Local 391 because of their honoring the picket line involved in this case. Local 391 also directly supplements the payments made by International. The payments began, pursuant to the provisions of the constitution, two weeks after the picket line was established.

6. Local 391 represents employees of the plaintiff in various bargaining units in North Carolina. Pilot and Local 391 have been parties to labor contracts regulating wages, hours, and terms and conditions of employment of the employees represented by Local 391. Each of said contracts contains a grievance procedure established for the purpose of resolving all disputes between the parties involving the application and interpretation of such agreement. In every case, majority decisions by the grievance committees established by the contracts are final and binding on all parties.

Pilot and Local 391, with the approval of International, are parties to a contract entitled "National Master Freight Agreement" (N.M.F.A.). In addition, Pilot and Local 391 have contracts which supplement the N.M.F.A. These are the Over-the-Road and City Cartage Supplemental Agreements (Supplemental). They are also parties to contracts covering other employees not covered by the N.M.F.A. These contracts are the Carolina Automotive Maintenance Agreement (Maintenance) and the Kernersville Terminal and Maintenance Office Agreement (Office).

7. Article 7 of the N.M.F.A. provides that the·grievance machinery "may be invoked only by the authorized Union representative or the Employer."

Article 8 of the N.M.F.A. provides for the processing of all grievances or questions of interpretations arising under the N.M.F.A. or supplements. It specifically provides for mandatory use of the grievance machinery in Section 1(a) for "All factual grievances or questions of interpretation arising under the provisions of the Supplemental Agreement, (or factual grievances arising under the National Master Agreement) . . . ." and in Section 1(b) for "Any matter which has been referred pursuant to Section 1(a) above, or any question concerning the interpretation of the provisions contained in the Master Agreement, shall be submitted to a permanent National Grievance Committee . . . ."

Section 2 of Article 8 of the N.M.F.A. provides for determining whether a work stoppage, slowdown, walkout, or cessation of work in violation of the contract is or is not authorized, and if unauthorized, the means for terminating such. Subsection (b) of Section 2 provides for submission to the grievance machinery at the national level the question of whether the International or the local union has met its obligations in stopping an unauthorized work stoppage, and second, whether the International or local union "separately or jointly, participated in an unauthorized work stoppage, slowdown, walkout, or cessation of work *in violation of the Agreement* by calling, encouraging, assisting, or aiding in such stoppage, etc., in violation of this Agreement, . . . ." The other provisions of Section 2 further detail the working of the grievance machinery, and when its decisions are binding on the parties.

8. Article 9 of the N.M.F.A. provides:

(1) It shall not be a violation of this Agreement, and it shall not be cause for discharge or disciplinary· action in the event an employee refuses to enter upon any property involved in a primary labor dispute, or refuses to go through or work behind any primary picket line, including the primary picket line of Unions party to this Agreement,

and including primary picket lines at the Employer's place of business.

.   .   .   .   .   .

(5) Within five (5) working days of filing of grievance claiming violation of this Article, the grievance shall be submitted directly to the National Grievance Committee without taking any intermediate steps, any other provisions of this Agreement to the contrary notwithstanding.

9. Article 44 of the Supplemental Agreement declares:

The Unions and the Employers agree that there shall be no strikes, lock-outs, tie-ups, or legal proceedings, without first using all possible means of a settlement as provided for in this Agreement, of any controversy which might arise. Disputes shall first be taken up between the Employer and the Local Union involved. Failing adjustment by these parties, the following procedure shall then apply:

10. The Carolina Automotive Maintenance Agreement and the Kernersville Terminal and Maintenance Office Agreement both contain provisions similar to Article 44 of the Supplemental agreement and to Article 9, Section 1, of the N.M.F.A. Both contracts provide for mandatory and binding grievance procedures as in Article 44.

11. On February 26, 1974, a picket line was set up at the entrances of Pilot's terminal at Kernersville, North Carolina, with pickets carrying signs reading "PILOT FREIGHT CARRIERS, INC., JACKSONVILLE, FLORIDA UNFAIR. REFUSE TO BARGAIN FOR JACKSONVILLE, FLORIDA EMPLOYEES WITH TEAMSTERS LOCAL UNION 512." Local 512 has been attempting to gain recognition by Pilot at its operation in Florida. It has set up its picket lines at Pilot's operations in other states. As a result of the picket line the following number of employees have not honored the picket line at the Kernersville terminal: 150 out of 700 over-the-road drivers; 3 out of 225 dock workers; 6 out of 40–50 local drivers; 10–12 out of 150 maintenance employees; and 15–20 out of 75 office employees. Pilot's operations have been severely curtailed.

12. On March 1, 1974, Local 391 put out a notice to its members ordering them not to become involved in the picket line but indicating that those employees who honored the picket line were relying upon Article 9 of the N.M.F.A. which gave the members the right not to cross a primary picket line.

13. On March 1, 1974, Pilot filed grievances requesting an interpretation of whether a concerted work stoppage is in violation of Article 44 of the Supplemental agreement, and of Article 8 of the Maintenance agreement, and of Article X of the Office agreement. On March 22, 1974, Pilot attempted to invoke Section 2(a) of Article 8 in order to determine whether the strikes at its terminals were authorized. The Area Directors for the Southern and Eastern Conference of Teamsters refused to act on the request stating that it was not timely.

14. One of the stipulations of the parties is as follows:

h. The National Grievance Committee established under the National Master Freight Agreement heard a case involving Pilot and Local 728, Atlanta, Georgia, in Chicago, Illinois, on March 22, 1974. A copy of the transcript of that hearing is attached as defendant 391 IBT's Exhibit V.

The Committee concluded:

[O]n the basis of the facts presented and on the basis of Pilot Freight Carrier, Inc.'s injunctive proceedings [in federal court in Georgia] presented to the committee, which applies against individual employees covered by the National Master . Freight Agreement who were respecting the picket lines established at Atlanta, Georgia and Dalton, Georgia, Pilot Freight Carrier, Inc. is in violation of the provisions of Article 9.

The Committee did not concern itself with Article 44 of the Supplemental agreement which is involved in this case. It had no jurisdiction over the Maintenance or Office agreements involved here.

15. Pilot's revenue has decreased approximately one half since its employees have honored Local 512's picket line. It is losing about $150,000 a day in revenue.

16. The Court takes notice from its earlier abortive hearing on this matter which was held on March 21, 1974, that Pilot has attempted to resolve its labor problems in good faith.[1]

## II.

### Discussion

The specific issue before the Court is whether it has authority to issue an injunction in order to enforce the mandatory grievance procedures of the parties' contract. The defendants contend that Section 4 of the Norris-La-Guardia Act, 29 U.S.C. § 104 prohibits the issuance of an injunction. They claim that Local 391 has no dispute with the plaintiff company and that its members are merely exercising their right under Article 9 of the N.M.F.A. to refrain from crossing the picket line set up by members of Local 512. Thus they say that since there is no dispute, there is nothing to arbitrate and thus there exists no ground for issuance of a *Boys Markets* injunction. (Boys Markets v.

Retail Clerks Union, 398 U.S. 235, 90 S. Ct. 1583, 26 L.Ed.2d 199 (1970)). In support of that position defendants cite Amstar Corp. v. Amalgamated Meat Cutters & B. Workmen, 468 F.2d 1372 (5th Cir. 1972), and Pilot Freight Carriers, Inc. v. Local 560, Int. Bro. of Team., 373 F.Supp. 19 (D.N.J.1974).

Plaintiff, on the other hand, relies upon Monongahela Pow. Co. v. Loc. No. 2332 Int. Bro. of El. Wkrs., 484 F.2d 1209 (4th Cir. 1973). (This Court is, of course, bound by the precedent of its own Fourth Circuit decisions, as opposed to that of the Fifth Circuit.) In that case, the workers of a local at one of the company's plant divisions refused to cross a picket line set up by members of a different local who worked at another of the company's divisions. The company brought an action in district court seeking damages and injunctive relief on the grounds that the refusal to cross the picket line constituted a work stoppage which was forbidden by the parties' contract and was in violation of said contract. The contract contained a provision for mandatory arbitration of disputes concerning "the interpretation, application, or claimed violation of any express provision of the Agreement." As in the instant case, the defendant union claimed that the refusal to cross the picket line was an individual decision not promoted by the union and was protected by Section 7 of the National Labor Relations Act, 29 U.S.C. § 157, and thus was outside the reach of the *Boys*

1. This case was removed from state court to this court and defendant Local 391 filed a motion to dissolve the state court's TRO. Plaintiff asked for preliminary injunction and preferential consideration. Upon returning from court in another division of this district in mid-afternoon on Friday, March 8, 1974, the Court conferred with counsel for the parties. Thereafter, negotiations between counsel were conducted until Saturday afternoon, March 9, when the Court heard the parties, in chambers, on defendants' motion to dissolve the state court's TRO. The Court elected to allow the state court's TRO to expire by its own terms on Sunday, March 10. The parties negotiated in good faith the following week but on Monday, March 18, advised the Court that negotiations had terminated, that an amended complaint had been filed making International a party, and that local counsel agreed to waive formal notice and have the preliminary injunction hearing on Thursday, March 21. Counsel for International appeared at the hearing, protested lack of formal notice and advised the Court that International was not in a position to proceed at that time. Rather than to hear the matter twice, the Court instructed the plaintiff to consult with the Clerk of this Court, have the matter scheduled for hearing at an appropriate time and to give adverse parties formal notice. This hearing was held on April 3, 1974.

*Markets* decision. The court concluded that the matter was subject to arbitration, saying: "[w]hile there exists a statutory right of employees to refuse to cross a picket line of another union, 29 U.S.C. § 158(b), this right may be waived, and was waived here, by the action of their union in agreeing to a no-strike clause." (484 F.2d at 1214).

The defendant union contends that the particular factual situation of this case does not fall within that of the *Mononga-hela* decision since it has Article 9 in its agreement which specifically permits its members to honor a primary picket line. That statement, however, begs the real question before the Court which is whether the parties have agreed to submit the controversy to a mandatory contractual grievance procedure. The decision in *Boys Markets* set out guidelines for district courts to follow in deciding whether injunctive relief is appropriate. The court in *Monongahela* reiterated those as follows:

(1) the collective bargaining agreement must contain a mandatory adjustment or arbitration procedure; (2) the court must first determine that the strike is over a grievance which both parties are contractually bound to arbitrate; (3) the court must order the employer to arbitrate as a condition of his obtaining an injunction against the strike." fn. 14, 484 F.2d at 1214.

The Court concludes that those three criteria exist in this case. Here there is a mandatory grievance adjustment procedure. Article 8 of the N.M.F.A. provides for the submission of all factual grievances and questions of interpretation to the grievance procedure. Article 7 of the N.M.F.A. provides that the grievance machinery may be invoked by both the employer and an authorized union representative.

The N.M.F.A. specifically covers work stoppages and cessation of work in violation of the agreement. Section 2(a) of Article 8 provides for a determination of whether a work stoppage is authorized by the union, and for taking corrective action if it is unauthorized. Section 2(b) explicitly provides for use of the grievance machinery at the national level in case the work stoppage is unauthorized in violation of the agreement.

Moreover, Article 44 of the Supplemental agreements between Local 391 and Pilot prohibits strikes and tie-ups without first resorting to use of the grievance machinery. The Maintenance and Office agreements have similar provisions.

Having found that the parties have a mandatory grievance procedure, the Court must next decide whether there is a dispute or controversy which the parties are bound to arbitrate. The defendants contend that Article 9 of the N.M.F.A. clearly gives their members the right to refuse to cross a primary picket line. They claim that this alleged right is not an arbitrable matter and that the determination of whether Local 512's picket line is a primary or secondary one lies within the exclusive competence of the National Labor Relations Board (Board). The Court concludes otherwise.

The duty of this Court in an action brought pursuant to 29 U.S.C. § 185 in determining the issue of arbitrability is limited to whether the claim of the party seeking arbitration is one which on its face is governed by the contract. Winston-Salem Printing Press & A. U. v. Piedmont Pub. Co., 393 F.2d 221 (4th Cir. 1968). It is not within the province of this Court to determine the merits of the controversy, that being a matter for the grievance committee.[2] Tobacco Wkrs. Int. U., Local 317 v. Loril-

2. Thus the Court specifically refrains from deciding whether the Local 512's picket line involves a primary or secondary dispute. The Court does note, however, that there is room for argument on both sides of the is-

sue. See: Secondary Boycotts—Ally Doctrine, 13 A.L.R. Fed. 466 (1972), and Local 391 v. Vulcan Materials Company, 208 N.L. R.B. No. 81. It is interesting to note, however, that in *Pilot Freight Carriers, Inc.* and

lard Corporation, 448 F.2d 949 (4th Cir. 1971); Local No. 6, B. M. & P. Int. U. of Am. v. Boyd G. Heminger, Inc., 483 F.2d 129 (6th Cir. 1973); H. K. Porter Co., Connors Div. W. Va. W. v. Local 37, United Steel, 400 F.2d 691 (4th Cir. 1968).

In the instant case, Article 8 of the N. M.F.A., Article 44 of the Supplemental agreements, and the Maintenance and Office agreements all provide for mandatory use of the grievance machinery either in the case of work stoppages and cessation of work in violation of the contract, or in the case of strikes and tie-ups. The decision of the grievance committee may be binding on the parties. It is abundantly clear from the contract that the parties intended to give up the right to strike or to stop work until they had resorted to their grievance procedure. In fact, the Supreme Court has recently stated in Gateway Coal Co. v. Mine Workers, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583, 596 (1974), n. 15, that if the contract makes arbitration the exclusive and compulsory means for resolving disputes, then these same arbitration provisions themselves give rise to an implied no-strike duty. The Supreme Court went on to emphasize the fact that a *Boys Markets* injunction could be issued on the basis of an implied no-strike duty. It said:

> Thus, an arbitration agreement is usually linked with a concurrent no-strike obligation, but the two issues remain analytically distinct. Ultimately, each depends on the intent of the contracting parties. It would be unusual, but certainly permissible, for the parties to agree to a broad mandatory arbitration provision yet expressly negate any implied no-strike obligation. Such a contract would reinstate the situation commonly existing before our decision in *Boys Market*. Absent an explicit expression of such an intention, however, the agreement to arbitrate and the duty not to strike should be construed as having coterminous application. (414 U.S. at 382, 94 S.Ct. at 639, 38 L.Ed.2d at 594–595)

In the case before this Court, not only is there a mandatory and binding grievance procedure, but there also is an explicit no-strike clause. The contract provides in detail how the parties are to proceed when there is a strike or work stoppage. The Court need not examine whether the contract has specifically covered the fact situation in this case. It is enough to say that the parties have entered into a contract which, either by express language or at least by implication, subjects any dispute concerning a strike or work stoppage to the mandatory settlement provisions of the contract. In addition to *Monongahela,* see Northwest Airlines, Inc. v. Air Line Pilots Ass'n, Inter., 442 F.2d 251 (8th Cir. 1971) which also held that the crossing of picket lines was a proper subject of arbitration.

■ Article 9 of the N.M.F.A. in no way changes this conclusion.[3] It only preserves the right to cross a primary

---

International Bro. of Teamsters, 208 N.L.R.B. 138 (a unit determination proceeding) the Board found that the Florida operation was not an accretion to Pilot's existing national collective-bargaining unit using many of the same factors relevant in *Vulcan Materials.* (This determination by the Board is the one for which the court in Boire v. International Brotherhood of Teamsters, etc., *infra*, issued an injunction.)

3. The Court cannot accept the argument that the refusal to cross a picket line does not involve a dispute between the union and the employer which is subject to arbitration. Not only does *Monongahela* conclude other-

wise, but in Gateway Coal Co. v. Mine Workers, *supra*, the Supreme Court rejected a similar type of contention when it was argued that safety matters were foreign to the arbitration process. The Court concluded: "Certainly industrial strife may as easily result from unresolved controversies on safety matters as from those on other subjects, with the same unhappy consequences of lost pay, curtailed production, and economic instability." 414 U.S. at 379, 94 S.Ct. at 637, 38 L.Ed.2d at 593. In the present case, the dispute clearly involves a matter suitable to the arbitration process. In fact Section 5 of Article 9 of the N.M.F.A. itself provides for the filing of a grievance claim-

picket line without such action being a violation of the contract. It in no way rescinds the express and implied no-strike clauses in the parties' contracts. *See* Gateway Coal Co. v. Mine Workers, *supra.* In fact, it does not even purport to cover *all* picket lines. In light of Article 9, it would even appear by negative inference that crossing a secondary picket line could be a violation of the contract, and thus the question of whether a picket line is primary or secondary could itself by an arbitrable matter in each dispute. In such case, it would seem self-evident that the parties intended to submit such question to their grievance procedure, rather than immediately resort to self-help. In any event, in order to encourage arbitration and to prevent industrial strife, the Court cannot but conclude that the parties must use their mandatory grievance procedure to settle the dispute over whether an employee has a right to refuse to cross a picket line.

A similar conclusion was reached on similar facts by the court in NAPA Pittsburgh, Inc. v. Automotive Chauffeurs, etc., 363 F.Supp. 54 (W.D.Pa. 1973). There, the court had before it a refusal to cross a picket line in a situation similar to the instant case. The parties had a broad arbitration provision in their contract also. They also had a reservation of rights clause in regard to crossing primary picket lines. In granting an injunction, the court stated:

> The Contract contained, under Article XIII, a specific provision for picket lines. In light of this specific provision it would seem that the question of the right to cross a picket line was made part of the Agreement over which the arbitration clause became a compulsory method of procedure which this Court must enforce.

It is noted that it is not the Court's role to make an independent examina-

tion of the merits of the dispute and we have not done so. We have confined ourselves solely to an analysis of the case at bar through the contractual language of the Collective Bargaining Agreement as set forth by the parties. (363 F.Supp. at 57–58).

■ In determining whether a dispute is within the mandatory settlement provisions of a contract, the Court is bound to view the language liberally in favor of arbitration. As stated in *Monongahela,* at 1213: "The Supreme Court has stated that courts should liberally construe such agreements, resolve all doubt in favor of arbitration, and order arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' " Here there is no express provision excluding this dispute from the grievance machinery, nor is there a forceful evidence of a purpose to exclude the controversy from grievance. Gateway Coal Co. v. Mine Workers, *supra,* 414 U.S. at 380, 94 S.Ct. at 638, 38 L.Ed.2d at 593, n. 10. In fact, the contract evidences the opposite conclusion—that the parties actually intended to include these disputes over crossing a picket line within their grievance machinery. (See footnote 3).

■ The defendant union makes the additional argument that this matter is not the proper subject of arbitration since the resolution of the dispute concerns the question of whether Local 512's picket line is illegal in violation of 29 U.S.C. § 158(b)(4). The union claims that that matter is within the exclusive jurisdiction of the National Labor Relations Board. Assuming this to be the case, it is not unusual that the parties will have contracted to arbitrate an issue that may also fall within the Board's jurisdiction. In fact, this same situation arose before this Court when it was contended that the Florida opera-

---

ing violation of that article. This positively refutes defendants' contention that a claimed violation of Article 9 does not involve a

grievance or dispute arising out of the contract, or that the dispute is not an arbitrable matter.

tions of Pilot were an accretion to its operations in other states. In that case, this Court ordered the issue be submitted to grievance even though the Board might have, and ultimately did take, jurisdiction of the controversy also. *See* Pilot Freight Car, Inc. v. International Bro. of Team., etc., 353 F.Supp. 869 (M.D.N.C.1972). When the Board began its unit determination hearing (see footnote 2), it sought an injunction pending decision, and the matter came before the Fifth Circuit in Boire v. International Brotherhood of Teamsters, etc., 479 F.2d 778 (5th Cir. 1973). There the court specifically agreed with the position of this Court and held that the arbitrator's decision must ultimately defer to the Board's ruling. Thus as stated in Radio Television Technical School, Inc. v. N. L. R. B., 488 F.2d 457, 461 (3rd Cir. 1973): "Although it is the well established policy of the Board to encourage settlement of labor-management disputes through the machinery of arbitration, the Board is not duty bound to defer to every decision of an arbitrator." The court in *Boire, supra,* at 803, noted the advantages of having arbitration take place even when the Board has jurisdiction over the dispute:

> For example, had the arbitrator decided *against* the Teamsters, further Board proceedings quite possibly would have been rendered unnecessary. In addition, in cases such as *Carey* [Carey v. Westinghouse Elec. Corp., 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320], when the representational question is often strongly tied into contract interpretation rather than a pure unit determination, the need for receiving a final construction of the contract is readily apparent.

In the instant case, the grievance committee's decision only involves Local 391's right to honor the picket line, and as far as the Court can determine, does not purport to affect the right of Local 512 to picket. Thus in this case there appears little chance of direct conflict between the grievance committee's decision and a Board ruling. However, even if there were a real possibility of conflict, that would not be an unusual situation, and it would not very likely dissuade the Court from enforcing the arbitration provisions of the contract.

The Court concludes that the dispute in this case falls under the mandatory grievance adjustment procedure provisions of the parties' contract, and that there is no serious danger that an order enforcing the grievance procedure will undermine the authority of the National Labor Relations Board. Therefore, the Court will order arbitration as a condition for the issuance of an injunction.[4]

■ Since the three guidelines for issuing a *Boys Markets* injunction, as set out above, have been all met, the only remaining question is whether an injunction would be appropriate in this case under ordinary principles of equity. The Supreme Court in *Boys Markets,* quoting from the dissent of another case, set out the principles as follows: " 'whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance.' " (398 U.S. at 254, 90 S.Ct. at 1594, 26 L.Ed.2d at 212). The Court concludes that those conditions for issuance of an injunction are

---

4. The defendants make some claim that the decision by the National Grievance Committee (See Finding No. 14) has decided the issue. That decision only involved Local 728 in Georgia, and did not purport to determine Local 391's rights under its contract. It never mentioned Article 44 of the Supplemental contracts before this Court, nor did it or could it affect Pilot's grievances under

the Maintenance and Office agreements. Furthermore, while the Court has doubts about the scope of the decision, it is sufficient to note that the decision itself appears to be a less than complete interpretation of Article 9 of the N.M.F.A. The Court concludes that the decision does not affect the present case.

present in this case. The alleged breach of the contract is continuing. The company has been seriously crippled by the refusal of the employees to cross the picket line. Most departments have been almost completely shut down. The Court concludes that the equities of the situation lie in favor of the company. The parties contracted for a mandatory grievance process. That process includes attempting to resolve disputes over the refusal to cross another union's picket line. If the union did not wish to have to go to grievance over whether it could cross a picket line, it could have explicitly exempted the refusal to cross any picket line from the grievance procedure, rather than just exempting the refusal to cross primary lines. Gateway Coal Co. v. Mine Workers, *supra*. Having elected only to reserve its rights in regard to primary picket lines, the union may not now be heard to complain because it now has to submit the matter to grievance rather than immediately honoring Local 512's picket line. The strong policy in favor of the arbitration of labor disputes, United Steelworkers v. Warrior & G. Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), must prevail over the union's desire to immediately exercise its alleged rights under the contract.

■ The Court finds that Local 391 is the agent of International. See Finding No. 5 and the cases cited therein. This case appears to present a stronger showing of agency and direct involvement due to International's payment of out-of-work benefits to members of Local 391 because of the work stoppage resulting from employees honoring the picket line of Local 512. Further, the advice given by Local 391 in posters and letter to its members, and the out-of-work supplements, constitute affirmative conduct in support of the work stoppage. It has a duty "under the [collective] bargaining agreement to do all within its power to terminate any conduct by its members which violated the agreement." *Monongahela, supra*, at 1214–1215.

## III

### Conclusions of Law

1. The Court has jurisdiction of this matter pursuant to 29 U.S.C. § 185.

2. The dispute or controversy between the parties involving the refusal of those Pilot employees who are members of Local 391 to cross the picket line set up at Pilot's terminals is a matter subject to the mandatory grievance procedures of the parties' contracts, and thus this Court has authority under *Boys Markets* to issue an injunction.

3. The Court concludes that the equities of the situation favor the employer and that an injunction ought to issue in order that the parties may exhaust their mandatory grievance procedures.

4. The Court concludes that Local 391 is acting as the agent of International in the present situation, and that International is itself directly involved in aiding the members of Local 391.

It is, therefore, ordered:

1. That defendant Local 391 and defendant International, their officers, agents, attorneys, and persons acting in concert with them be, and hereby are, enjoined and directed, pending trial of this cause on its merits, or a valid and proper exhaustion of contractual remedies, to end the work stoppage now in effect by forthwith notifying the members of Local 391 that the right to cross Local 512's picket line set up at plaintiff's terminals is now a matter which is subject to their grievance procedure and, that any member who relies upon his alleged contractual rights to refuse to cross such picket line would be acting in violation of this injunction.

2. That defendant Local 391 and defendant International, their officers, agents, attorneys, and persons acting in concert with them will take immediate affirmative action to end the work stoppage and encourage the members of Local 391 not to rely upon their alleged contractual rights in deciding not to cross Local 512's picket line set up at plaintiff's terminals, and that they are

free to resume their work for the plaintiff.

3. That defendant Local 391 and defendant International, their officers, agents, attorneys, and persons acting in concert with them are hereby enjoined and restrained from taking any action either verbal or financial which would aid, assist, encourage, or any way support the decision of any member of Local 391 to honor Local 512's picket line at plaintiff's places of business.

4. That defendant Local 391 and defendant International, their officers, agents, attorneys, and persons acting in concert with them be, and hereby are, enjoined and restrained from calling or causing any strike, slow-down, work stoppage, or similar concerted activities among the plaintiff's employees during the pendency of this cause because of any of the issues involved herein so as to affect the operations of plaintiff's business.

5. It is a condition of this order that the plaintiff shall file in the office of the Clerk of this Court a bond approved by said Clerk in the amount of $150,000, by which the plaintiff shall undertake and agree that in the event it is finally determined that this order should not have issued, then the plaintiff will pay the defendant such damages, up to the aforesaid amount, as the defendant may have suffered by reason of the issuance of this order.

6. This order shall become effective at 12:00 noon on Saturday, April 6, 1974, or as soon thereafter as the bond required herein is filed by the plaintiff.

7. This order is conditioned upon the plaintiff's proceeding promptly and in due course to comply with the mandatory grievance procedures set forth in the contracts, and submit for grievance the issues raised before this Court which concern Articles 8 and 9 of the NMFA. and Article 44 of the Supplemental Agreements, and the corresponding provisions in the Maintenance and Office agreements. This order shall remain in

full force and effect pending resolution by the respective grievance committees whereupon application may be made to this Court for further orders in this matter.